Paul LUDWIG et al., Plaintiffs-Appellants,

v.

ARMOUR & COMPANY, a Corporation, Defendant-Appellee, Cross-Appellant.

Local 1142 and Local 8, United Packinghouse, Food & Allied Workers, AFL–CIO, Unincorporated Associations, Intervenors-Appellees, Cross-Appellants.

No. 53024.

Supreme Court of Iowa.

May 7, 1968.

Kindig, Beebe, McCluhan & Rawlings, Sioux City, for plaintiffs-appellants.

Shull, Marshall, Marks & Vizintos, Sioux City, and Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant-appellee and cross-appellant.

Cotton, Watt, Jones & King, Chicago, Ill., and Harry H. Smith, Sioux City, for intervenors-appellees and cross-appellants.

STUART, Justice.

The primary question before us in this case is whether the execution or application of the collective bargaining agreement entered into between Armour and Company (Armour) and the United Packinghouse, Food and Allied Workers, AFL–CIO (UPWA) violates Iowa's right to work law, specifically section 736A.3, Code of Iowa.

Armour is a producer and processor of meat and meat products. It is engaged in interstate commerce and is subject to federal regulation. On March 13, 1967 it entered into a "Master Agreement" with UPWA International representing its local unions which were bargaining agents at Armour plants including Local 1142 and Local 8, intervenors herein. Included in this collective bargaining contract, were the following provisions pertinent to this action:

"4.10 Membership Requirement—State Laws.

"(a) The parties recognize that the Union is required to represent all of the Employees in the bargaining unit, whether or not they are members of the Union, and that the benefits of this Agreement accrue to all Employees. Therefore, where the provisions for a union shop under Section 4.1 may not be enforced because of the restrictions imposed by state law, the clause appearing in Appendix 'B' shall be applicable, if permitted by state law." (Appendix "B" is not permitted by Iowa law. Section 736A.4)

"Article XXV. 25.1 Notice of Plant Closing.

"The Company shall give notice in writing to both the International and Local Union of the closing of a plant * * * at least six (6) full calendar months prior to such closing. An employee * * * of the affected plant * * * who is permanently separated from the service as a result of such closing * * * shall be paid (regular wages for every work day in said six month period after his separation)."

"ARTICLE XXIV–B REPLACEMENT PLANTS

"24.1 Seniority and Service Rights in Replacement Plants.

"When the Company gives notice of the closing of a plant pursuant to Section 25.1 of the Master Agreement and the Company has established or thereafter establishes a replacement plant (as defined by the automation committee), employees with seniority rights in the closed plant shall be offered employment at the replacement plant in order of seniority. * * * The replacement plant shall be covered by the terms of the Master Agreement."

"APPENDIX H — AUTOMATION FUND * * *

" * * * The company, therefore, agrees with the Union to continue the Automation Fund established on September 1, 1959. The Automation Fund shall continue to be administered by a committee of nine, composed of four representatives of Management and two representatives selected by each of the two Unions, and an impartial chairman selected by mutual agreement of the parties. * * *

"In addition, the committee shall make determinations and formulate procedures under the terms of the Master Agreement as follows: * * *

"Fifth, in accordance with Section 24.1 of Article XXIV–B, define a replacement plant."

On September 29, 1967, Armour closed the packing plant it had been operating in West Point, Nebraska. On the same date it announced its plant in Omaha would close March 29, 1968.

On Saturday, October 28, 1967 Armour acquired a packing plant in Sioux City from Iowa Beef Packers, Inc. The employees in this plant were not covered by a collective bargaining agreement. The following notice was posted on the plant bulletin board the same day.

"TO ALL SIOUX QUALITY EMPLOYEES:

"We are pleased to announce that effective at the close of business today, the operations of the Sioux Quality Packers Division will be taken over by Armour and operated under 'business as usual' conditions. Procurement, slaughter and all other operations will continue on a normal basis.

"Employees are requested to report for work as scheduled.

"Armour and Company."

On October 31, 1967 an Armour representative read an announcement to all hourly employees of the Sioux City plant. The pertinent parts follow.

"I know that the question uppermost in the minds of each of you is what will happen as far as my job is concerned. We are asking that all production employees continue their duties on a business as usual basis. Current wages and payroll benefits will continue for the present.

"In all honesty and fairness to all of you, we need to point out that Armour and Company is a party to Master Labor Contracts with the United Packinghouse, Food and Allied Workers and Amalgamated Meat Cutters and Butchers Workmen of North America at other meat processing facilities throughout the country. Under the terms of these labor agreements, *it is possible* that this plant could be determined to be a replacement or a newly established plant. If this should happen, the job opportunities here would be subject to the transfer and seniority provisions of the Master Agreements. No decision has been made, therefore we do not know what the outcome will be."

On November 9, 1967 the question whether Sioux City was a replacement plant for West Point and Omaha was taken to the Automation Committee. The committee on November 10, 1967 decided it was a replacement plant. The company complied with the ruling and agreed with UPWA on the steps by which it would be implemented.

Under this ruling and the terms of the Master Agreement set forth above, the

77 employees of Armour's West Point plant who indicated a desire to come to the Sioux City plant would, on a seniority basis, replace the same number of present employees who have practically no seniority with Armour.

Mr. Clark, Armour's vice-president in charge of labor relations also testified: "To the extent that people from Omaha come to Sioux City on March 29th when the Omaha plant is closed, the equivalent number of Sioux City people would be laid off at that point. At that point it is possible that the number of people that would be transferred in from Omaha and West Point could easily go over the 200 figure of present employees at the Sioux City plant. It could be possible that by April 1st all the current Sioux City employees at the Sioux City plant would be laid off and those 200 people that would be laid off would have no benefits other than the possible benefit of being recalled at the option of Armour, up until the point at which the expansion of this plant takes place."

Eleven men with top seniority at the West Point plant were notified to report for work at the Sioux City plant December 4, 1967. Plaintiffs who were non-union employees of the former owner of the plant brought this class action for all such employees and obtained a temporary injunction which prevented the laying off of present employees and the transfer of these eleven men.

Hearing was held December 19, 1967 and on December 29, 1967 the trial court ruled the Master Agreement did not violate Iowa's right to work law, dissolved the temporary injunction and dismissed plaintiffs' petition. Plaintiffs appealed and Armour and the intervening UPWA local unions cross-appealed claiming the court erred in finding the Iowa courts had jurisdiction of this dispute.

I. The record is clear the Master Agreement was drawn in an attempt to comply with the law of those states which had enacted statutes prohibiting compulsory union membership. It is also clear the right to replace the present employees is based solely on seniority with Armour and Company. All of the 77 men who made application to transfer from West Point were members of UPWA but there was no showing all West Point employees were union members or that non-union members were deprived of the opportunity to transfer. Nebraska law does not permit a union shop agreement.

Plaintiffs main contention is based on the following facts stated by Mr. Clark on cross-examination: "I think it is true that Armour and Company pursuant to the Master Agreement with the United Packinghouse, Food and Allied Workers is bringing in West Point and Omaha employees and the 200 presently employed local people at the Sioux City plant who are not affiliated with that union will be laid off pursuant to the agreement between Armour and the United Packinghouse, Food and Allied Workers and with which the employees at the Sioux City plant in no way participated."

Plaintiffs contend an agreement which produces this result is per se illegal and in violation of section 736A.3 which in part, provides:

"736A.3 It shall be unlawful for any * * * corporation or labor organization to enter into any * * * contract * * * to exclude from employment * * * persons who do not belong to * * * a labor union, * * * or because of resignation or withdrawal therefrom."

Plaintiffs contend under this section they "are specifically exempted from the burden of having to prove they are being fired or laid off *because they were non-union members, when they are being laid off pursuant to a contract between a company and a union."*

We do not so read section 736A.3. Its pertinent parts make unlawful those agreements which directly or indirectly require

a person to belong to a labor union in order to obtain or retain a job. The Master Agreement does not require compulsory union membership where prohibited by law. It places a duty on Armour to provide its employees with the greatest seniority the opportunity to continue to work for the company under circumstances appearing here. This is job security by reason of length of service not union security by compulsory membership. The fact the employees' right to transfer arises from the collective bargaining agreement does *not, in our opinion, make such contract unlawful under Iowa's right to work law.* Present employees are subject to lay off because their length of service with Armour is less than that of employees who by contract have been given the opportunity to transfer.

As far as the record shows, plaintiffs and those in a like situation had no individual employment contracts or a collective bargaining agreement guaranteeing them job security or benefits in the event the employer ceased operating the plant. Excluding possible unfair labor practices, which are not our concern, Armour or the former employer could have fired or laid off any of plaintiffs or other employees at will. Mr. Clark testified even if Armour had had no contractual obligation it would have, as a matter of management responsibility, done the same thing in recognition of the company's obligation to its long-term employees. If the employer could have exercised such right as the prerogative of management, the fact that it became an obligation under a collective bargaining agreement does not violate the right to work law.

"This section in no way interferes with the normal exercise of an employer's right to choose his employees, or to discharge them, with or without cause. The so-called 'Right to Work' law places but one limitation upon the employer's right to discharge an employee, and that is that such discharge cannot be made 'on account of' union membership or nonmembership of the employee." Sand v. Queen City Packing Company, N.D. 108 N.W.2d 448, 451.

Plaintiffs emphasize Mr. Clark's testimony that there might have been an entirely different result if plaintiffs had been represented by another certified union and that it is doubtful the matter would have been taken to the automation committee under such circumstances. They claim this proves they were excluded from jobs because they were non-union employees. We do not agree. If plaintiffs had been represented by a union, the collective bargaining agreement would have contained some provision for job security or termination benefits if the employer ceased operating the plant. The terms of the sale and Armour's obligations would have been influenced by this fact.

Plaintiffs claim chapter 736A says "when people do determine that they don't want a union to represent them, they have the same protection as though a union did represent them". This overstates the effect of chapter 736A. It prohibits management and unions from entering into agreements which would force an individual to join a union against his will in order to get or keep a job. It does not guarantee employees of a non-union plant the same job security which might be obtained through legitimate collective bargaining.

We do not believe a provision in a collective bargaining agreement which gives employees of a closed plant the privilege of transferring to a replacement plant on the basis of seniority of service alone is within the concept of union security agreements prohibited by 736A.3. For examples of prohibited provisions see the annotation in 92 A.L.R.2d 598, 617. We need not determine whether we would reach the same result if it were shown all employees of the closed plant were members of the union.

■ II. Even if we were to hold this contract violated the Iowa right to work

law, plaintiffs would still be faced with a troublesome jurisdictional question. The federal government has preempted the field of labor relations generally and state jurisdiction is limited to these instances which come within the exception to such preemption appearing in section 14(b) N.L.R.A., 29 U.S.C. § 164(b) which provides:

"Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

While we do not decide the jurisdictional question here, we feel it useful to point out we believe it extremely doubtful the interpretation of our law suggested by plaintiffs would come within the 14(b) exception.

In N.L.R.B. v. Tom Joyce Floors, Inc., 9 Cir., 353 F.2d 768, 770–771, the Nevada court held a non-discriminatory union hiring hall contract proposal violated the Nevada right to work law. The federal court accepted the state interpretation of the state law, but concluded:

"But section 14(b) of the Act does not protect a state statute which is so broadly stated or construed. Section 14(b) allows states to prohibit agreements which require union membership as a condition of employment. But state right-to-work laws cannot be construed to prevent collective bargaining on subjects not properly reserved to state regulation by section 14(b). The extent to which section 14(b) authorizes states to limit collective bargaining is a federal question."

It is difficult to see how a provision which requires an opportunity be given employees whether union or not to transfer under certain conditions, requires union membership as a condition of employment.

These comments are not to be construed as holding we lacked jurisdiction. The decision the Master Agreement did not violate Iowa's right to work law makes such holding unnecessary. We do not wish to decide such an important question on the cursory examination of the authorities made herein. As bearing on the jurisdictional question see: Dugdale Construction Co. v. Operative Plasterers, etc., Ass'n., 257 Iowa 997, 1000, 135 N.W.2d 656, 659; San Diego Bldg. Trades Council, etc. v. Garmon, 359 U.S. 236, 238, 79 S.Ct. 773, 3 L.Ed.2d 775, 783; N.L.R.B. v. Houston Chapter, Associated General Contractors of America, 349 F.2d 449, 453 (C.A.5th); Retail Clerks, etc. v. Schermerhorn, 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678, reargued 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179; International Ladies Garment Workers Union Local 415 v. Scherer & Sons, Inc., 57 L.C. § 51, 813.

For the reasons stated in Division I the trial court is affirmed. Expense of printing the brief and argument of UPWA to be taxed as court costs is limited to $1.50 per page plus sales tax.

Affirmed.

All Justices concur.