Dale STRICKER, Plaintiff and
Appellant,

v.

SWIFT BROTHERS CONSTRUCTION
COMPANY, a corporation, Carpenters
Local Union # 783, and Max Adler, De-
fendants and Respondents.

No. 11799.

Supreme Court of South Dakota.

Argued Sept. 14, 1976.

Decided Dec. 14, 1977.

J. B. Lammers, of Lammers, Lammers &
Kleibacker, Madison, for plaintiff and ap-
pellant.

James R. Becker, of May, Johnson &
Burke, Sioux Falls, for defendant and re-
spondent Swift Brothers Const. Co.

Robert L. O'Conner, Sioux Falls, Harry
H. Smith, of Smith & Smith, Sioux City,
Iowa, for defendant and respondent Car-
penters Local Union # 783 and Max Adler.

DUNN, Chief Justice (on reassignment).

Plaintiff, a nonunion carpenter, brought
this action against his former employer,
Swift Brothers Construction Company
(Swift Brothers), Carpenters Local Union
# 783 (the union), and Max Adler, the un-
ion's business representative, seeking dam-
ages for the termination of his employment
status with Swift Brothers. His complaint

alleged that defendants had, either jointly or severally, caused the termination of his employment because of his nonunion status, contrary to the provisions of SDCL 60–8, the right-to-work law. The complaint also alleged that the defendants had acted in an oppressive or malicious manner in tortiously and unlawfully interfering with his employment contract with Swift Brothers. The complaint prayed for general damages in the amount of $30,000 and for punitive damages in the amount of $50,000. After interrogatories had been served and answered and the depositions of plaintiff, Adler and Robert Swift, the president of Swift Brothers, taken, defendants moved for summary judgment. The trial court stated in its memorandum opinion that the wrongful act complained of by plaintiff fell within the orbit of § 8(a)(3) and § 8(b)(2) of the National Labor Relations Act, 29 U.S. C.A. § 158(a)(3) and (b)(2), and that the state court was without jurisdiction to consider plaintiff's claim because the claim was preempted under federal law. Accordingly, the trial court granted defendants' motions for summary judgment and entered judgment dismissing plaintiff's complaint for lack of jurisdiction. We affirm.

As established by the pleadings, affidavits, interrogatories and depositions, the pertinent factual background is as follows.

Plaintiff is an experienced construction worker and carpenter. Late in February of 1974, he spoke with Robert Swift about securing employment with Swift Brothers. He was instructed to contact Swift Brothers' construction foreman on the construction project Swift Brothers was undertaking for Minnesota Mining and Manufacturing Company at Brookings, South Dakota. Plaintiff did so, and, on February 25, 1974, plaintiff started working for Swift Brothers at the Brookings project. Plaintiff had been told by Mr. Swift that he would receive scale wages of something over $7 per hour on the Brookings job. When plaintiff received his paycheck at the end of the first week he discovered that he was being paid at the rate of $5.50 per hour. Plaintiff spoke with the job foreman, who advised him to call Mr. Swift. Plaintiff called Mr.

Swift and was told that because plaintiff had been receiving $5.50 per hour from his prior employer Mr. Swift thought that plaintiff would be satisfied if Swift Brothers paid him at the same rate until, in plaintiff's version of the conversation, " * * * they got this agreement taken care of with the union, and when this agreement with the union was taken care of, then I would get the seven dollar some cents, whatever it was." When plaintiff replied that perhaps he should quit and go back home to work at $5.50 per hour, Mr. Swift responded by telling him that he was sure that the agreement with the union would be worked out by the following Friday. Plaintiff agreed to stay on the job and returned to work the following week. Upon receiving his weekly paycheck the following Friday, plaintiff was told by the job superintendent that an agreement with the union had been finally signed that day and that he would have to lay plaintiff off. He advised plaintiff to go down to Sioux Falls and talk to Mr. Adler. Early the following week plaintiff went to union headquarters in Sioux Falls and spoke with Adler, who said that he knew nothing about plaintiff's situation. Plaintiff then asked Adler whether he could keep his job in Brookings if he joined the union. Adler replied that plaintiff could join the union if he wanted to but that he would have to have his name put on the list and would be called for work only when the list got down to plaintiff's name. Plaintiff responded by saying that if he had to join the union to get his job but couldn't even keep the job by joining the union he would have to find work elsewhere. Plaintiff called Ray Swift later that day and told him that Adler had said that he could do nothing about plaintiff's job status. Mr. Swift responded with a derogatory comment about Adler's veracity and advised plaintiff that if he joined the union Swift Brothers could pick his name off the list and put him back on the job. Plaintiff heard nothing further from Mr. Swift and secured employment with one of his former employers within a week or so.

The deposition testimony of Robert Swift reveals that at the time plaintiff was hired, Swift Brothers was in the process of negotiating an agreement with the union. Prior to February 25, 1974, Robert Swift mentioned to Adler that Swift Brothers was contemplating hiring plaintiff, to which Adler responded by stating that when the agreement was finalized the union would want to have plaintiff's employment put on a referral basis. Mr. Swift also told Adler early during negotiations that the company had four people on the job whom the company wanted to retain including one Max Doren, a nonunion carpenter. Adler voiced no objection to Doren's employment, nor, apparently, to that of the other three, possibly, in Robert Swift's opinion, because Doren had been hired before the start of negotiations.

A meeting was held on or about March 7, 1974, for the purpose of finalizing an agreement between Swift Brothers and the union on the Brookings project. Present at the meeting were Robert and Ray Swift and Adler and two other union officials. At one point during the meeting Adler asked who was employed on the Brookings job. In Robert Swift's words,

> "[W]e mentioned the name of Mr. Stricker. Max slammed his books together and said, we can't reach any agreement with that, and I said, now, just a minute, Max, no need of getting excited. Let's talk this thing over. If we can get Mr. Stricker to appear in your office and be referred to the job, there's no need of getting this matter—breaking down our negotiations on this agreement, and it was our understanding that he would entertain Mr. Stricker in his office and this matter would be resolved."

Although Robert Swift denied advising his job superintendent to terminate plaintiff's employment subsequent to the meeting, he acknowledged that he had told him that in order to get the project agreement resolved it would be a good idea to send plaintiff to Adler's office for referral to the job and that that would probably avoid a lot of difficulties. He also acknowledged that after the notebook-slamming incident he and Adler had reached an agreement that Swift Brothers was to contact plaintiff and send him down to see Adler. It was on the basis of that oral agreement that the project agreement was signed.* Further, Robert Swift acknowledged that he felt that he was under some pressure from Adler to lay plaintiff off and to refer him to the union in order to get the project agreement signed. He testified that the company was satisfied with plaintiff's job performance and "would have liked to have had him back."

Adler testified that he refers nonunion as well as union carpenters and that he gives no preference to his union people in referrals, although he acknowledged that he had referred no nonunion carpenters to the Brookings job. In response to a question concerning the manner in which he classifies nonunion carpenters with union carpenters, Adler testified:

> "The man would take the test and if he could pass that test and still tell me he doesn't want to belong to the union, I would have to say, Mister, you're quali-

---

\* The agreement provided in part that:

"Section 1. The Contractor recognizes the Union as the major source of recruiting employees and shall immediately contact the Union representative when he wishes to employ men. *The Union agrees that its selection of applicants for referral shall be on a non-discriminatory basis, not based on or affected by* race, creed, color, national origin, *union membership,* by-laws, rules, regulations, constitution or any other aspect of union membership, policies, or requirements. (emphasis added)

Section 2. In selecting applicants, the Union shall refer applicants according to the following priority:

- (a) Those requested by name who have previously worked in the area described in this contract within the past two years.
- (b) Those who are required to have special skills such as Millwrights, Piledrivers, Finishers, etc.
- (c) Those having four (4) years' experience in construction and who have resided two (2) years in the area covered by this Contract.
- (d) Those having four (4) years' experience and one (1) years' residency in the area covered by this Contract.
- (e) All others."

fied and I'll put you down and when your name comes up I'll send you out."

At no time did he testify, however, that he had informed plaintiff that his name would be placed on the list at his request notwithstanding his nonunion status.

Defendants contend that even if plaintiff's discharge was based upon his nonunion status, such discharge was at most an unfair labor practice under the provisions of the National Labor Relations Act and thus cognizable only by the National Labor Relations Board (NLRB). With respect to this argument we note that the record supports, and plaintiff does not challenge, defendants' claim that Swift Brothers is subject to the jurisdiction of the NLRB. Plaintiff, on the other hand, contends that the state court has jurisdiction to hear this action under the exception to the preemption doctrine arising from the authority given to the states by § 14(b) of the National Labor Relations Act, 29 U.S.C.A. § 164(b), to prohibit the execution or application of any agreement requiring membership in a labor organization as a condition of employment.

29 U.S.C.A. § 158(a) provides in part:

"(a) It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

\*     \*     \*     \*     \*     \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization  \*  \*  \*."

29 U.S.C.A. § 158(b) provides in part:

"(b) It shall be an unfair labor practice for a labor organization or its agents—

(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein  \*  \*  \* ;

(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership  \*  \*  \*."

29 U.S.C.A. § 164(b) provides:

"(b) Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law."

Article VI, § 2 of the South Dakota Constitution and SDCL 60–8–3 provide in identical language that:

"No person shall be deprived of life, liberty or property without due process of law. The right of persons to work shall not be denied or abridged on account of membership or nonmembership in any labor union, or labor organization."

Section 14(b) of the National Labor Relations Act, 29 U.S.C.A. § 164(b), provides for an exception to the general rule stated in *San Diego Building Trades Council v. Garmon,* 1959, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775, that, in the absence of an overriding state interest, courts must defer to the exclusive competence of the NLRB in cases in which the activity that is the subject matter of the litigation is arguably subject to the protection of § 7 or the prohibitions of § 8 of the National Labor Relations Act. It does not empower states to ban all involuntary relationships between workers and unions. It merely allows the prohibition of "agreements requiring *membership* in a labor organization as a condition of employment  \*  \*  \*." 29 U.S.C.A. § 164(b) (emphasis added). See also, *Laborers' International Union v. Kunco, Inc.,* 1973, 8 Cir., 472 F.2d 456, 458.

The agreement being challenged in this case does *not* require membership in a union as a condition of employment, however, and merely sets up an exclusive, nondiscriminatory hiring hall of a type which has been explicitly approved by the United States Supreme Court in *Local 357 Teamsters v. NLRB,* 1961, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11. Three U.S. Courts of Appeals have held that a hiring hall provision such as this one is not within the exception allowed by § 14(b). *N.L.R.B. v. Houston Chapter, Associated General Contractors,* 1965, 5 Cir., 349 F.2d 449; *N.L.R.B. v. Tom Joyce Floors, Inc.,* 1965, 9 Cir., 353 F.2d 768; *Laborers' International v. Kunco, Inc.,* supra.

The plaintiff relies on cases concluding that § 14(b) gives states the power to prohibit agency shop agreements. *Retail Clerks Local 1625 v. Schermerhorn,* 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678; *Retail Clerks v. Schermerhorn,* 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179. These cases are distinguishable because agency shop provisions have been held to be, for all practical purposes, compulsory unionism agreements. We do not believe an exclusive, nondiscriminatory hiring hall is tantamount to a compulsory unionism agreement and the Courts of Appeals' decisions cited supra are in accord.

Viewing the evidence as strongly in the plaintiff's favor as possible, all it shows is that he lost his job as did the employee in *Local 357 Teamsters,* supra, because he was not referred through the nondiscriminatory union hiring hall. The plaintiff asked whether he could keep his job if he joined the union, and was informed that he could join the union, but he would still have to be placed on the job referral waiting list. There is no evidence showing an agreement to require membership in the union and that is the key fact that must be shown before § 14(b) can be used to give a state court jurisdiction under its right-to-work law.

A large body of decisional law has been established by the National Labor Relations Board and the federal courts recognize the Board's expertise in the field of labor law. Since the written agreement between the union and the company is not a compulsory unionism agreement, the plaintiff is alleging, at most, discrimination against him as an individual. We believe individual alleged discriminatory firings done purportedly to encourage or discourage union activity are better handled by an administrative board with expertise, and we feel bound to apply the preemption doctrine to the facts of this case.

The judgment is affirmed.

ZASTROW, PORTER and MORGAN, JJ., concur.

WOLLMAN, J., dissents.

WOLLMAN, Justice (dissenting).

I would reverse the summary judgment and remand the case for trial.

Defendants' position is that, assuming for purposes of argument that the events leading up to and resulting in the termination of plaintiff's employment were based upon plaintiff's nonunion status, their respective roles in such events constituted conduct prohibited by 29 U.S.C.A. § 158(a)(1) and (3) and (b)(1) and (2) and therefore clearly preempted from state court jurisdiction under the broad principles of preemption announced in *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775.

The most recent discussion of the preemption doctrine by the United States Supreme Court is found in *Farmer v. United Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338, wherein the Court summarized the various exceptions to the *Garmon* doctrine. See also *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842; *Lodge 76, International Association of Machinists and Aerospace Workers v. Wisconsin Employment Relations Commission,* 427 U.S. 132, 96 S.Ct. 2548, 49 L.Ed.2d 396; *Walles v. International Brotherhood of Electrical Workers,* Iowa, 252 N.W.2d 701; *Bebensee v. Ross Pierce Electric Corp.,* 400 Mich. 233, 253 N.W.2d 633; Cox, "Labor Law Preemption Revisited," 85 Harv.L.Rev.

1337 (1972); Bryson, "A Matter of Wooden Logic: Labor Law Preemption and Individual Rights," 51 Tex.L.Rev. 1037 (1973).

We need not speculate whether in the absence of our right-to-work law plaintiff's claim would fall within the exception created by the decision in *Farmer,* supra, or one of the other exceptions discussed therein, for I conclude that under the exceptions to exclusive federal jurisdiction recognized by the United States Supreme Court as arising from a state's interest in vindicating the provisions of its right-to-work law, the trial court had jurisdiction to consider plaintiff's suit.

In *Algoma Plywood and Veneer Co. v. Wisconsin Employment Relations Board,* 336 U.S. 301, 69 S.Ct. 584, 93 L.Ed. 691, the Court acknowledged that § 14(b) was included within the Taft-Hartley Act to forestall the inference that federal policy regarding the regulation of union security agreements was intended to be exclusive. In reaching this conclusion the Court stated:

> "It is argued, however, that the effect of this section [§ 14(b)] is to displace State law which 'regulates' but does not wholly 'prohibit' agreements requiring membership in a labor organization as a condition of employment. But if there could be any doubt that the language of the section means that the Act shall not be construed to authorize any 'application' of a union-security contract, such as discharging an employee, which under the circumstances 'is prohibited' by the State, the legislative history of the section would dispel it." 336 U.S. at 314, 69 S.Ct. at 591, 93 L.Ed. at 702.

Any doubt that the states retained jurisdiction to enforce their right-to-work laws was laid to rest by the two *Schermerhorn* decisions. In *Retail Clerks Local 1625 v. Schermerhorn,* 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678, the Court held that § 14(b) permits the states to prohibit agency shop agreements. After reargument on the preemption question, the Court held that state courts have jurisdiction to enforce the provisions of state right-to-work laws that pro-

hibit agency shop agreements. *Retail Clerks Local 1625 v. Schermerhorn,* 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179. See also, *Oil, Chemical and Atomic Workers v. Mobil Oil Corp.,* 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736; *Communications Workers v. Western Electric Co., Inc.,* Colo., 551 P.2d 1065; *Ficek v. International Brotherhood of Boilermakers,* N.D., 219 N.W.2d 860, and cases cited therein.

Defendants contend that because the agreement between the union and Swift Brothers provides for nothing more than a nondiscriminatory hiring hall arrangement of a type that has received sanction under federal law, *Local 357 Teamsters v. NLRB,* 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11, and because several federal courts have held that a nondiscriminatory hiring hall agreement may not be prohibited under the provisions of a state's right-to-work law, see *NLRB v. Houston Chapter, Associated General Contractors,* 5 Cir., 349 F.2d 449; *Laborers' International Local 107 v. Kunco, Inc.,* 8 Cir., 472 F.2d 456; *NLRB v. Tom Joyce ·Floors, Inc.,* 9 Cir., 353 F.2d 768, the agreement in question gives plaintiff no right of action cognizable by the courts of our state.

Although the Supreme Court held in *Plumbers' Union v. Borden,* 373 U.S. 690, 83 S.Ct. 1423, 10 L.Ed.2d 638, that a claim by a union member against his union based upon the alleged refusal of the union to refer him for employment under a hiring hall agreement was within the jurisdiction of the NLRB and that the state court was without jurisdiction to consider the claim, the holding did not discuss the effect of the state's right-to-work law on the question of jurisdiction. As the Court explained in the *Farmer case,* supra, concurrent state court jurisdiction over such a claim would have impaired significantly the functioning of the federal system because a state court determination that held hiring hall procedures unlawful would render meaningless the earlier approval of those same procedures by the NLRB. 430 U.S. at 298, 97 S.Ct. at 1063, 51 L.Ed.2d at 350, n. 9. Again, however, the Court had no occasion

to consider whether a claim of unlawful discrimination in violation of a state right-to-work law would be preempted under federal law.

I conclude that under the principles expressed in the *Schermerhorn* and *Farmer* cases, supra, plaintiff's claim is not preempted from state court jurisdiction. The conflict between state and federal law has been sanctioned by Congress, with the states having been given authority to bar the execution and enforcement of union security agreements. Once granted such authority, perforce a state has a substantial interest in protecting the rights its citizens have under the provisions of the state's right-to-work law. The potential for interference with federal regulation is reduced, if not eliminated, for the vindication of the provisions of a state's right-to-work law is not within the area of primary federal concern and is not part of the federal regulatory scheme.

Because this case was decided below on defendants' motions for summary judgment, we must view the evidence in a light most favorable to plaintiff. SDCL 15–6–56(a); *Wilson v. Great Northern Ry. Co.,* 83 S.D. 207, 157 N.W.2d 19.

> "[A] party moving for summary judgment is not entitled to a judgment merely because the facts he offers appear more plausible than those tendered in opposition, or because it appears that the adversary is unlikely to prevail at trial." 10 Wright & Miller, Federal Practice and Procedure § 2725, p. 514.

Moreover, "[T]he evidence presented to the court always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from it." Id. § 2727, p. 526.

It is possible to draw the inference from Adler's deposition testimony that the project agreement would not have been signed had Swift Brothers not agreed to terminate plaintiff's employment and refer him to the union for referral back to the job. In response to a question whether he would have signed the agreement in spite of plaintiff's nonunion status, Adler testi-fied that he would have been forced to take up the grievance procedure that was contained in the preexisting contract the union had with Swift Brothers. Accordingly, I cannot say that defendants are entitled to judgment as a matter of law, for under the evidence presented by the record genuine issues of material fact exist with respect to plaintiff's allegation that his employment was terminated as a result of an agreement between Swift Brothers and the union to discharge him because of his nonunion status. I would therefore reverse the judgment entered in favor of defendants and remand the case to the circuit court for trial.